**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL YOUNG, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-1592 |
| | § | |
| | § | |
| BRENTON DELON GREEN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is an excessive-force case against the City of Houston and one of its police officers

arising out of an incident in front of an Athlete's Foot shoe store in December 2010.  The plaintiffs

— Michael Young, Sr., Michael Young, Jr., Joseph Young, Ashley Young, Michelle Bell and Fred

Bell, individually, and as next friends of Christopher Bell and Christian Bell — sued Officer Brenton

Green, individually and in his official capacity, and the City of Houston.  The plaintiffs alleged that

Officer Green used excessive force against Michael Young and Michelle Bell and that the other

plaintiffs witnessed the use of force.  Michael Young also asserted claims for unlawful seizure, cruel

and unusual punishment, violations of due process and equal protection, and conspiracy.  This court

previously granted summary judgment dismissing the plaintiffs' federal-law bystander claims

against Green and their state-law tort claims against Green in his individual capacity.  (Docket Entry

No. 37).

The City of Houston moves for summary judgment on the plaintiffs' remaining federal and

state-law claims.  (Docket Entry No. 39).  Green moves for summary judgment on the excessive-

force claims against him.  (Docket Entry No. 48).  The plaintiffs have also moved for leave to file

an amended complaint to assert premises-liability claims against Athlete's Foot and additional negligence claims against the City based on its policies and customs concerning its officers' mental health.  (Docket Entry No. 48).

Based on the pleadings; the record; the motions, responses,[1] and replies; and the relevant law, this court grants summary judgment dismissing the following claims:

•   Michael Young's cruel and unusual punishment claims against the City and Green;

•   Michael Young's due process claims against the City and Green;

•   Michael Young's conspiracy claims against the City and Green;

•   Michelle Bell's excessive-force claims against the City and Green;

•   the plaintiffs' bystander claims against the City;

•   Michael Young's failure-to-train, failure-to-investigate, and failure-to-discipline claims against the City; and

•   the plaintiffs' state-law claims against the City.

This court denies summary judgment on:[2]

•   Michael Young's excessive-force claim against Green;

---

[1]  The City of Houston objects to the plaintiffs' supplemental response to the City's motion for summary judgment, (Docket Entry Nos. 45, 46), and supplemental exhibits, (Docket Entry No. 46, Ex. 1), as untimely.  (Docket Entry No. 47).  The court previously granted the plaintiffs' motion to extend the deadline to respond to the City's summary-judgment motion to September 24, 2012.  The plaintiffs filed their supplemental response and exhibits on September 25.  Federal Rule of Civil Procedure Rule 6(b) allows a district court to grant extensions of time prior to the expiration of a deadline for "good cause."  FED. R. CIV. P. 6(b).  When a deadline has expired, Rule 6(b)(1)(B) allows a court to consider a motion for an extension of time for excusable neglect.  FED. R. CIV. P. 6(b)(1)(B).  This court declines to strike the plaintiffs' supplemental response and exhibits which were filed only one day after the deadline.  Even if this court were to strike the plaintiffs' supplemental response and exhibits, it would not effect the resolution of the City's summary-judgment motion.

[2]  Green has not moved for summary judgment on Michael Young's unlawful seizure claim or on his qualified immunity defense to that claim.  Green has also not moved for summary judgment on his qualified immunity defense to Michael Young's equal-protection claim.

- Green's qualified-immunity defense to Michael Young's excessive-force claim; and

- Michael Young's equal-protection claim against Green;

Finally, this court denies the plaintiffs' motion for leave to amend their complaint.

The reasons for these rulings are explained below.   A status and scheduling conference is set for **March 5, 2013** at 2:00 p.m in Courtroom 11-B.

## I.   Background

### A.   "Midnight Madness"

On December 22, 2010, Joseph Young and his cousins, Christian and Christopher Bell, went to an Athlete's Foot store to buy the new model of Air Jordan™ basketball shoes for themselves and family members.  Expecting a crowd because of the store's announced "Midnight Madness" sale, they arrived in the morning and waited outside the store all day.  (Docket Entry No. 39, Ex. D at 9, 22).

Later in the evening of December 22, Joseph, Christian, and Christopher were joined by other family members.  Michael Young, Sr., Joseph's father, arrived at the Foot Locker around 11:00 p.m.  (Docket Entry No. 39, Ex. D at 10).  When Michael Young arrived, Christian Bell and his mother, Michelle Bell, were waiting in a car outside the store.  Fred Bell, Michelle Bell's husband; Ashley Young, Michelle Bell's daughter; and Michael Young, Jr., Michael Young, Sr.'s son, were also  waiting outside the store.  (*Id*. at 14–15).  Tyrone Latchley, who provided security for Joseph Young's high school basketball team, came to help make sure that no one took the shoes that they bought.  (Docket Entry Nos. 39, Ex. E at 10; D at 17; 54, Ex. G).

As midnight approached, the waiting crowd swelled to several hundred people.  Some began acting "rowdy."  (Docket Entry Nos. 39, Exs. E at 9, 41; F at 16; 43, Ex. 2 at 39; 54, Ex. G).  Several

officers, including Officer Benton Green and Sergeant Shannon Winters, were dispatched to the Athlete's Foot store. (Docket Entry No. 43, Ex. 2 at 36). Winters told the officers that they would not be providing security for the store and should intervene only if the crowd posed a threat. (*Id.*, at 40–41). According to Green, the officers noticed several disturbances in the crowd involving individuals pushing and fighting one another. (*Id.* at 45).

The store doors opened on time, at midnight. As customers started coming out of the store with shoes, some of the people in the crowd tried to "bum rush" the door. (Docket Entry No. 39, Exs. E at 9; F at 14; D at 17).

Joseph Young and Christian Bell entered the store at around 12:45 a.m. Joseph Young bought several pairs of shoes. (Docket Entry No. 39, Ex. E at 9). When he left the store, he saw a police officer and a security guard standing near the doors. His father, Michael Young, was standing nearby. (*Id.* at 17). Michael Young saw his son leave the store, and began walking toward him, working his way through the crowd. (Docket Entry No. 39, Ex. D at 24). As Joseph Young was handing the bags with the shoes he had purchased to his father, someone in the crowd grabbed a pair of the shoes. (Docket Entry No. 39, Ex. E at 17). A police officer was able to retrieve the bag and returned it. Joseph Young gave the shoes to his father. (Docket Entry No. 39, Ex. E at 17; Ex. D at 24). The security guard and the HPD officer standing near the store's entrance offered to escort Michael and Joseph Young away from the store. (Docket Entry No. 39, Ex. D at 25, 28–29).

These facts are largely undisputed. There are, however, competing versions of what happened next.

According to Michael Young, when he turned to walk away from the store, he felt something hit him hard in the back of his head, knocking him forward. (Docket Entry No. 39, Ex. D at 29).

Michael Young turned and saw Officer Green standing behind him, holding a baton.  It appeared that Officer Green was preparing to strike a second time.  Michael Young asked Officer Green why he had hit him.  (*Id*. at 31).  Officer Green responded that Michael Young had elbowed him. Michael Young, who is very tall, later testified that he was holding the bags of shoes above his head and that it would have been impossible for him to have elbowed Officer Green, who is much shorter. (*Id*. at 31–32).

In his deposition, Officer Green disputed Michael Young's description.  Officer Green stated that, while he was waiting in the parking lot next to the Athlete's Foot store, he saw the crowd "surge" around Michael Young.  He believed that Michael Young was "pushing and shoving at some other individuals." (Docket Entry No. 43, Ex. 2 at 45, 47).  Green approached Michael Young and tried to grab his arm, but Young pulled away and grabbed Green's jacket.  Green stated that he felt himself "going off balance like I was being thrown to the ground."  (*Id*. at 47–48).  He "attempted an angle strike to get [Young's] hand off my jacket." (*Id*. at 48).  Green explained that he had intended to hit Young's hand but accidentally struck his head.  After Green hit him, Michael Young released his hold on Green's jacket.  (*Id*. at 51).  Green acknowledged that he did not announce his presence as a police officer to Young before grabbing or striking him.  (*Id.* at 59).

Michael Young denied that he pushed anyone while waiting outside the store.  Young also testified that he did not see anyone fighting around him.  (Docket Entry No. 39, Ex. D at 25, 30).

Joseph Young, Michelle Bell, and Tyrone Latchley saw parts of Green's initial contact with Michael Young.  Joseph Young stated that just after he handed the shoes he had purchased to his father, he saw Young's eyes roll back into his head.  For the next few moments, his father looked dazed.  (Docket Entry No. 39, Ex. E at 17–19).  But Joseph Young did not see what or who had hit

5

Michael Young.  (*Id.* at 17–19).  When Michael Young turned around, he was surrounded by police officers.  As they all walked toward the store's parking lot, Michael Young was holding his head. (*Id.* at 20–21).

Michelle Bell testified that, after receiving the shoes from Joseph Young, Michael Young turned and bent down to secure them.  When he started to straighten up, an "officer came out of nowhere and hit him across the head with a stick."  (Docket Entry No. 39, Ex. F at 20).  Michael Young turned around and asked, "Who hit me?"  (*Id.*).  Michelle Bell testified that Officer Green was about to swing the baton at Michael Young again but Michael Young, Jr. grabbed the baton out of Green's hands and threw it away.  (*Id.* at 19–20).

Tyrone Latchley stated in a sworn affidavit that he saw Michael Young grab bags of shoes and hold them over his head as he made his way through the crowd.  Latchley saw people grab at Joseph Young.  As Michael Young reached for his son, Latchley saw a "night stick coming out of the air," but he did not see it strike Young.  Latchley saw Officer Green push Michael Young and accuse him of hitting him on the head with his elbow.  Michael Young grabbed his head and accused Officer Green of hitting him in the head with his baton.  (Docket Entry No. 54, Ex. G).  After Officer Green struck Michael Young with his baton, Latchley and others saw Green lead Young through the store parking lot.  (Docket Entry No. 39, Ex. F at 32).  According to Latchley, Green had his baton out and was using it to push Young and his sons away from the crowd.  (Docket Entry No.54, Ex. G).

Joseph Young testified that he heard Officer Green say that he was "going to kill" Michael Young.  (Docket Entry No. 39, Ex. E at 20–21).  As Green approached Michael Young, Joseph Young tried to intervene by pushing his father away.  Joseph Young testified that he was concerned

6

that Officer Green was going to hit his father again and arrest him.  Joseph and Michael Young testified that Officer Green then grabbed Joseph Young by his neck with one hand.  (*Id.* at 21, 44; Docket Entry No. 39, Ex. D at 98).  Joseph Young acknowledged that he was not injured.  (*Id.*, Ex. E at 25).  Michael Young told Green to stop grabbing his son and pushed Green's arm away from Joseph Young's neck.  (*Id.*, Ex. D at 99).  Officer Green responded, "Nigger, I will kill you," and then told Michael Young: "[p]ut your hands behind your back.  You're going to jail." (*Id.* at 33–36). Michael Young testified that Green was about to handcuff him but that other officers prevented it. (*Id.* at 37).

Officer Green acknowledged that he told Michael Young that he was under arrest and walked Young through the crowd to the patrol car.  According to Officer Green, before he handcuffed Young, he noticed another disturbance in the crowd and walked toward that area, away from Young. (Docket Entry No. 43, Ex. 2 at 54–55).

Michael Young testified that when Officer Green walked away, another officer told Young that he should leave.  Young responded that he would as soon as he could gather the rest of his family.  (Docket Entry No. 39, Ex. D at 38–39).  As he was leaving, Young asked Officer Green for his badge number.  Officer Green replied, "3622, motherfucker." (*Id.* at 42).

According to Officer Green, after he returned from investigating the other disturbance in the crowd, he saw Michael Young having a conversation with Sergeant Winters.  Young asked for Officer Green's badge number, which Green provided.  Officer Green denied using racial epithets or threatening to kill or injure Young.  (Docket Entry No. 43, Ex. 2 at 55–56).

At some point during these events, Michelle Bell tried to approach Michael Young.  She alleged that Green pushed her and told her to move back.  The push was hard enough that if her son,

Christopher Bell, had not been standing near her, she would have fallen.  Michelle Bell had recently had surgery to treat congestive heart failure and had medical devices attached to her stomach and heart.  (Docket Entry No. 39, Ex. F at 23, 48).  Michelle Bell testified that, after Green's push, her chest was sore near her pacemaker, but she did not need medical treatment.  (*Id*. at 33, 37).  Joseph Young saw Officer Green push Michelle Bell and testified that she did not look injured.  (Docket Entry No. 39, Ex. E at 25–27).

Michelle Bell and Tyrone Latchley testified that Michael Young, Jr. had taken off his shirt and looked "ready to fight."  (Docket Entry Nos. 39, Ex. F at 25; 54, Ex. G).  Michelle Bell stated that Michael Young, Sr. knocked his son over to prevent him from acting aggressively and being tasered by the police officers.  (Docket Entry No. 39, Ex. F at 25).

A police sergeant came over to Michael Young and his family and said that everything was a misunderstanding and that they were going to let everyone go home.  Michelle Bell testified that Officer Green said, "Yeah, get y'all's mother fuckin' asses away from here."  (Docket Entry No. 39, Ex. F at 27).

The Young and Bell families left the Athlete's Foot store and went to the home of Michael Young's parents.  (Docket Entry No. 39, Ex. E at 29).  About thirty minutes later, Michael and Joseph Young went to the St. Luke's Hospital emergency room because Michael Young's head was hurting.  St. Luke's diagnosed a concussion.  (Docket Entry No. 39, Exs. D at 46;  E at 29).  There was a knot on his head but no bleeding.  (*Id*., Ex. E at 29).  Although Joseph Young went to the hospital with his father, he did not seek medical treatment.  Joseph Young testified, however, that he now feels nervous whenever he sees a police officer.  (*Id*. at 30, 33, 37–38, 50).

Michael Young had persistent headaches.  He returned to the hospital on December 25, 2010.  (Docket Entry No. 39, Ex. D at 105).  He was also treated by a concussion specialist.  (*Id*. at 54–56).  Michael Young testified that, for a brief time, the concussion impaired his ability to work in his job as the University of Houston's director of basketball operations.  He had to take several days off because bright lights and loud sounds aggravated his condition.  (*Id*. at 107).  At his April 27, 2012 deposition, Michael Young testified that he still had headaches and believes that the baton strike affected his vision because, since the incident, he has had to use reading glasses.  (*Id*. at 59, 111).  He has not received any mental-health treatment but often thinks about the incident and sometimes has trouble sleeping.  (*Id*. at 80).

### B.     The Complaint and the HPD Investigation

On December 23, 2010, Michael Young filed a complaint against Green with the HPD.  (Docket Entry No. 39, Ex. D at 49–50).  The HPD's records state: "The compl alleges the officer struck him in the back of the head with his night stick/baton, causing injury.  The compl was not arrested.  See HPD incident report # 178242210-C."  (Docket Entry No. 40, Ex. A-6).  The HPD classified Michael Young's complaint as "Use of Force."  (*Id*.).     Michael Young filed a sworn affidavit with his complaint describing the events.[3]  The affidavit stated that "Officer B.D. Green"

---

[3]  The affidavit provided the following description:

> At Athlete's Foot Store with my sons to purchase shoes.  Store was opened late for the selling of tennis shoes.  Several people were at the door when my [son] was existing the store.  As he walked out the store, someone had taken one of the box of shoes that he had.  I was waiting outside of the door.  An officer working the store he retrieved shoe box from the person.  The officer had given me the box, I turned to walk away and another officer assisted me through the crowd.  As I proceeded through the crowd, Officer Green hit me behind my head with his club.  I turned around shocked because I was unaware of who hit me.  Then Officer Green began to shove me, yelling Nigger I will kill you!  He tried to hit me again, but I guarded

9

was the police officer responsible and listed Raymond Williams, Joseph and Michael Young, Michelle and Christopher Bell, Tyrone Latchely and the security guard and police officers at the store as witnesses.  In his affidavit, Young described his injuries as "large knot on top of head; memory loss; resulting in a concussion and brain injury."  (Docket Entry No. 46-1. at 9–14).

Officer Julian Ellis was an off-duty police officer working an extra job as a security guard at the Athlete's Foot store on the night of December 22, 2010.  He filed an "offense/incident report" on December 23 at 2:30 a.m.  His report is headed: "HPD Officer Strikes Customer."  Officer Ellis described what he had seen:

> I, Julian Ellis was assisting M. Young with another HPD officer out of the crowd with numerous bags of shoes from the front door. Finally, we were in the parking area.  Officer Green came from behind striking M. Young in the back of his head.  Young hands were above his head with bags of shoes when he was struck.  Officer Green said "Nigger I will kill you."  M. Young screamed to me, "Please get my boys.  They are going to hurt my boys!

(Docket Entry No. 46, Ex. 2).

---

> with my arms against the hit.  Other officers stood there then told me to leave the premises.  However, at that time my sons reacted in my defense and came near where I was.  Officer Green turned to my younger son Joseph; and he put his hands grabbing his throat.  I told him to release my son.  Then my older son reacted to what was happening.  Officer Green charged back at me, trying to handcuff me.  As I knew that I had not done anything, he continued to shout and curse at me, I asked him for his badge #; he shouted, "3622 Motherfucker.["] The officers looked as Officer Green solicited them to arrest me.  Officer Green shouted, let's get his ass.  The other officers stood there.  I was escorted to my car by the security guard of the store, who indicated that the officer was wrong.  My sons and other family members [unintelligible word].  There were several other witnesses, but names, addresses are being sought.

(*Id.*).

10

Lieutenant Timothy J. Allen with the HPD's Internal Affairs Division (IAD) directed the investigation into Michael Young's complaint.  (Docket Entry No. 43, Ex. 3 at 7).  Lt. Allen concluded that there were inconsistencies between the offense report Officer Green had filed and the administrative statement he gave Allen.  In the offense report, Green stated that he struck Michael Young's head because he feared for his safety.  In the administrative statement, Green stated that Young grabbed his jacket and that Green accidentally hit Young's head with the baton while aiming for his hands.  (*Id*. at 35–36).  Allen also noted that several of the witnesses he interviewed during his investigation reported that Green used racial epithets.  (*Id*. at 38).

Based on his investigation, Allen originally recommended finding that Green had violated the HPD's regulations on the use of force, truthfulness, the exercise of sound judgment, and the use of racial slurs.  (Docket Entry No. 43, Ex. 3 at 34).[4]  A Citizens' Review Committee (CRC) began reviewing Allen's draft report on March 31, 2011.  The review, completed on April 14, 2011, approved the report, commenting as follows:

> Officer Green made several violations of sound judgment and departmental policy; the sustained determination against charge of "truthfulness" is especially disturbing and use of baton at back of head is a gross misjudgment at best and malicious and unworthy of an HPD officer.  I have confidence he will be reprimanded appropriately and it sounds like Officer Green may need counseling and additional training or re-training before continued assignment.

(Docket Entry No. 40, Ex. A-10).

Investigations into complaints against HPD officers are subject to review by superior officers.  When a superior officer believes that the recommendations are not supported by the evidence, that officer is authorized to modify the investigative findings to reflect the evidence.

---

[4]  Allen's draft report is not in the summary-judgment record.

11

(Docket Entry No. 53, Ex. E at 37).  After reviewing Lt. Allen's draft report, Executive Assistant

Police Chief Dirden directed Lt. Allen to remove from the report the conclusions that Green had

been untruthful and used racial slurs.  Allen was also instructed to replace his conclusion that Green

had used excessive force with a conclusion that Green had mistreated citizens or prisoners in his

custody.  (Docket Entry No. 43, Ex. 3 at 34).

The HPD's final report on its investigation into Michael Young's complaint reached the

following conclusions:

> The investigation found sufficient evidence to prove that Officer
> Green's use of his baton, when Mr. Young was struck in the head,
> was improper and prohibited by policy.  Mr. Young alleges that
> Officer Green struck him in the head with a baton while he was trying
> to get his family members out of a cantankerous crowd.  Officer
> Green, in his administrative response, contends that the strike that hit
> Mr. Young's head was intended to hit Mr. Young's hand while he
> was grabbing his jacket.  Officer Green claimed that the fact that Mr.
> Young was struck in the head was unintentional and a result of Mr.
> Young trying to throw him to the ground.  Had Officer Green's baton
> strike been directed at the hand of Mr. Young, as Mr. Young's hand
> grasped Officer Green's jacket, it is highly unlikely the [sic] Officer
> Green's baton would have struck the back of Mr. Young's head as
> reported in the hospital records.  Mr. Young's family members all
> described Officer Green coming from behind Mr. Young and striking
> him with the baton.  Additionally, Mr. Ellis, a security guard
> employed by the store, described that he was following behind Mr.
> Young when Officer Green passed him, approached Mr. Young, [sic]
> from behind, and hit Mr. Young in the back of the head.  The
> evidence supported that after Officer Green misinterpreted the actions
> of Mr. Young as being a fight, he chose to intervene.  The evidence
> also supports that Officer Green made unnecessary physical contact
> with Mr. Young.

(Docket Entry No. 40, Ex. A-5).  The report further found:

> Evidence in the investigation is sufficient to prove that Officer Green
> exhibited poor judgment in choosing his course of action to intervene
> in the acts of people pushing that he observed within the crowd.
> Officer Green recklessly rushed into the situation, and without

> slowing to re-evaluate the situation as his perspective changed, Officer Green struck Mr. Young immediately; a course of action that could have resulted in deadly consequences. Officer Green's strike to Mr. Young's head, with his baton, [was] too weak to cause serious head injury and or incapacitation to Mr. Young. Officer Green's action only served to incite an already volatile situation.

(*Id.*). The IAD report concluded that Officer Green had violated the HPD's policies on the treatment of suspects, prisoners, and others,[5] and on the exercise of sound judgment.[6]

A June 16, 2011 memorandum from the HPD Chief of Police, Charles A. McClelland, Jr., affirmed the investigative report's conclusions that Officer Green had violated HPD policies:

> [T]he investigation revealed that in attempting to detain Mr. Young, Officer Green made unnecessary contact with Mr. Young. Further investigation revealed that, although Officer Green did document his actions in an incident report, he failed to follow established procedure when he neglected to properly notify a supervisor of the total circumstances surrounding the incident, as required.

Entry No. 40, Ex. A-11). In the memorandum, Chief McClelland found violations of HPD policies on the use of force; conduct and authority; and the treatment of prisoners, suspects, and others. The memorandum stated that Officer Green admitted responsibility for his actions and would receive a 20-day suspension. Chief McLelland stated that "in determining the severity of discipline," he

---

[5] HPD General Order 500-20 regarding "Treatment of Prisoners, Suspects, and Other Citizens" states in relevant part: "Employees shall avoid all unnecessary physical contact with all prisoners, suspects, and other citizens. Unnecessary contact may include, but is not limited to, pushing, shoving, dragging, punching, or kicking." (Docket Entry 40, Ex. A-9).

[6] HPD General Order 200-08 regarding "Conduct and Authority" states in relevant part:

> Employees' behavior will be limited to conduct that is reasonable and prudent. No employees will commit any act on duty or off duty in an official or private capacity that tends to bring reproach, discredit, or embarrassment to the department. Employees are expected to exercise sound judgment at all times.

(Docket Entry 40, Ex. A-8).

considered Officer Green's "disciplinary history, work record, and history in the Houston Police Department." (Docket Entry No. 40, Ex. A-11). In his deposition, Executive Assistant Chief Dirden testified that Officer Green was also removed from patrol duty during this litigation. (Docket Entry No. 53, Ex. E at 39).

### C.    The Relevant HPD Policies and Practices

The City of Houston has provided evidence about its training policies and requirements. All new HPD cadets must graduate from a six-month course at the HPD's Training Academy. The Training Academy meets or exceeds Texas Commission on Law Enforcement Standards and Education (TCLEOSE) standards. At the Academy, officers learn, among other things: how to gain control over a suspect or a scene, including the proper use of force and officer safety; weapons training, including for intermediate weapons like the baton; and the laws of arrest, search, and seizure, including rights under the Fourth and Fifth Amendments. Once cadets complete the Training Academy, they receive an on-the-job training course for four to six months through the HPD's Field Training Program. (Docket Entry No. 39, Ex. B at 2–4).

Officers are required to complete additional training throughout their HPD service. This training includes the proper use of force. Officers are subject to official HPD policies that are announced and reviewed in general orders, circulars, roll-call training videotapes, and training bulletins. Officers also receive formal performance evaluations twice each year. (*Id*. at 4).

The IAD investigates when HPD officers allegedly violate laws and HPD policies. When the IAD receives a complaint, it assigns an investigator to gather the relevant evidence and to interview the complainant and witnesses. The investigator drafts a report and submits it to an IAD lieutenant for review. Although officers officially have 180 days to complete a report, IAD Officer

14

Ridling testified that there was an unwritten policy that reports should be completed within 60 days if possible. (Docket Entry No. 43, Ex. 5 at 25–26). An IAD lieutenant makes an initial recommendation that may be modified or approved by IAD commanders based on whether the evidence shows that the alleged acts occurred and whether they violated laws or policies.

Investigative recommendations are generally classified as exonerated, unfounded, not sustained, sustained, justified, or not justified. When a commander determines that misconduct has occurred, the investigation may be reviewed by the Citizens' Review Committee, the subject officer's chain-of-command, the HPD's Administrative Disciplinary Committee, and the HPD's Legal Services Unit. The Executive Assistant Chief of Strategic Operations presents sustained complaints to the Chief of Police and makes disciplinary recommendations. The Chief of Police imposes discipline. (*Id*. at 4–5).

The HPD's policy on the use of force states, in part, that "[w]hen dealing with citizens, suspects, and prisoners, employees will limit their use of force and physical conduct to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control." (Docket Entry No. 40, Ex. A-13). The policy also states that, "[u]nless deadly force is warranted, baton strikes will be made only to areas of the body below the shoulders and only with the degree of force necessary to counter resistance or establish control of the suspect." (*Id*.). The use of deadly force is "limited to those circumstances in which officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death." (*Id*.). Officers are required to "consider their immediate surroundings and the safety of uninvolved citizens before using deadly force." (*Id*.; *see also* Docket Entry No. 39, Ex. B at 5).

Between March 2005 and March 2010, about 170 individuals were shot by HPD officers. Of these shootings, all but two were determined to have been justified. The remaining two were classified as "accidental" or "information." (Docket Entry No. 43, Ex. 1).

### D.    Officer Green's Employment History

Officer Green joined the HPD in 1995 after he was released from active duty by the U.S. Coast Guard. As a Coast Guard member, Green had not been subject to disciplinary action. (Docket Entry No. 39, Exs. C-1, C-2). As a cadet, Officer Green completed the HPD's Training Academy. By the end of 2010, Green had completed almost 2,200 hours of training. The areas included: the use of force and arrest/search/seizure (1996 and 1997); cultural diversity (1998, 2000, 2005, and 2008); soft-impact weapons (2000); racial profiling (2002); officer safety (2004 and 2005); ethics (2008); law (2008); decision-making and integrity (2008); and probable cause, search, and safety (2009). (Docket Entry No. 40, Ex. A-3).

A number of complaints have been filed against Officer Green since he joined the HPD. Excessive-force complaints were filed in 2001, 2002, and 2009. Officer Green was also the subject of complaints for improper police procedure, in 2001 and 2004; for conduct and behavior, in 2002, 2004, 2005, and 2007; and for harassment, in 2009. Aside from the 2009 complaint for improper police procedure, none of the complaints were sustained. (Docket Entry Nos. 53, Ex. E, at 14; 44).

Less than a year before he struck Young, Green shot Stephen Guidry during a traffic stop. Guidry was wounded but recovered. Sergeant Stephen C. Ridling conducted the IAD investigation into the shooting. (Docket Entry No. 43, Ex. 5 at 7). According to the May 14, 2010 investigation report, on February 24, 2010, at around 11:00 p.m., Green stopped Guidry's car for a traffic violation. Guidry initially did not pull over. Once he did, he refused to exit the vehicle and, instead

struggled with Green.  Green saw Guidry reach into his waistband and turn slightly.  Believing

Guidry might have a weapon, Green shot him in the back left side of the neck.  The other occupant

of Guidry's vehicle was noticeably drunk when police interviewed him.  The passenger told police

that he and Guidry had been drinking.  He also said that Guidry did not want to pull over because

he "had warrants."  Guidry and Green were the only witnesses to the shooting.  (Docket Entry No.

40, Ex. A-18).  Guidry refused police requests to interview him during the investigation.  (*Id*; Docket

Entry No. 43, Ex. 5 at 21).  The investigation "found no evidence to contradict Officer Green's

statements regarding his actions in this shooting" and recommended that the shooting be classified

as "intentional/justified."  (Docket Entry No. 40, Ex. A-18).  The Citizens Review Committee

reviewed and approved the IAD's report and recommendations.  (*Id*., Ex. A-18).[7]

## II.     The Summary-Judgment Motion

### A.     The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the

nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to

the district court — that there is an absence of evidence to support the nonmoving party's case."

*Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the

---

[7] The plaintiffs have also submitted and pointed to record evidence about Green's mental health and his use of psychotropic drugs, and the HPD's policies on its officers' use of prescription medications.  In their original complaint, however, the plaintiffs do not assert any claims arising out of these facts.

absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B.    Analysis

#### 1.    The Federal Claims

### a.    The Alleged Violations of the Prohibition Against Cruel and Unusual Punishment and of Due Process

The plaintiffs allege that Green violated the Eighth Amendment prohibition on cruel and unusual punishment and the Fifth and Fourteenth Amendment due process clauses.  These allegations arise out of Green's alleged use of excessive force.  "The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment."  *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996).  "The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."  *Id.*  The right of an individual who is neither a convicted state prisoner nor subject to pretrial detention to be free from excessive force by law enforcement is based in the Fourth Amendment's protection from unreasonable searches and seizures.  *See Williams v. Bauer*, 2013 WL 150180, at *2 (11th Cir. Jan. 14, 2002) (holding that excessive-force claims arising out of an arrest fall under the Fourth Amendment and not the Eighth Amendment).  Summary judgment is granted on the plaintiffs' due process and cruel and unusual punishment claims.

### b.    Excessive Force

Michael Young alleges that Green's unprovoked baton blow was unconstitutional excessive force.[8]  "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."  *Deville v. Marcantel*, 567

---

[8] Although the plaintiffs' complaint states that "Officer Green grabbed Joseph by the neck and throat with incredible force," (Docket Entry No. 1 at 5), it does not state that Joseph is alleging an excessive-force claim.  The complaint states that Young and several of his family members are asserting bystander claims. Even if Joseph had alleged excessive force, this court would grant summary judgment. Joseph acknowledged in his deposition that Green's grab did not injure him.

F.3d 156, 167 (5th Cir. 2009) (internal quotation marks omitted). "[W]hether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). A court must consider only the information available to the officer at the time and may not apply hindsight to second-guess an officer's conduct. *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (citing *Graham*, 490 U.S. at 397–97). A court must also recognize that officers often must make split-second decisions in stressful situations. *Graham*, 490 at 396.

There are two distinct inquiries in analyzing an excessive-force claim. The court must first consider whether a given course of conduct is constitutionally unreasonable as a matter of law. Second, the court must examine whether a given course of conduct actually happened, a question of fact. *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

It is undisputed that while Michael Young was walking away from the entrance of the Athlete's Foot store, Officer Green struck him in the back of the head with a baton. The parties do not dispute that Young was diagnosed with and received treatment for a concussion.

There is evidence that Michael Young did not notice Officer Green approaching him. Michelle Bell testified that immediately after Young was hit, he asked who had hit him. Officer Green did not announce his presence before hitting Michael Young with the baton. Latchley testified that he did not see Officer Green and Young interact until Green struck with the baton.

At his deposition, Green testified that he thought he saw Michael Young pushing and shoving other individuals around him and went to investigate.  Officer Green also testified that he grabbed Michael Young's arm but that Young pulled away and grabbed Green's jacket.  Green tried an angle strike to force Young to remove his hand, lost his balance, and accidentally struck Young on the back of the head with the baton.

Other evidence contradicts Officer Green's description.  Michael Young stated that he did not push anyone and did not see any fighting.  Latchley also stated that, although there was pushing in the crowd, he did not observe any fights around Michael Young.  Michael Young and Michelle Bell both testified that Officer Green appeared to be preparing to hit Young a second time.  This suggests that Green's blow may not have been inadvertent.  The fact that Green struck Michael Young in the back of the head also calls into question whether Young was facing Green and grabbed his jacket, as Green testified.

Officer Green gave inconsistent explanations about why he struck Michael Young.  Green told Michael Young that Young had elbowed him.  Latchley also testified that he heard Green repeatedly accuse Michael Young of elbowing him.  Lt. Allen testified that Green gave a report to the HPD stating that he had intentionally hit Young in the head out of concern for his safety.  Yet Green also said that he accidentally hit Young in the head while trying to hit his hand.

The record discloses factual disputes material to determining what happened.  Viewing the facts in the light favorable to the nonmovants, a reasonable factfinder could conclude that Green used excessive force in striking the back of Young's head with his baton.  Baton blows to the head are "a significant use of force" that is "capable of inflicting significant pain and causing serious injury."  *Young v. County of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011).  Such blows can be

"a significant intrusion upon an individual's liberty interests."  (*Id*.).  The HPD's policy on the use of baton strikes states: "[u]nless deadly force is warranted, baton strikes will be made only to areas of the body below the shoulders and only with the degree of force necessary to counter resistance or establish control of the suspect."  (Docket Entry No. 40, Ex. A-13); *see also* Neal Miller, *Less-Than-Lethal Force Weaponry: Law Enforcement and Correctional Agency Civil Law Liability for the Use of Excessive Force*, 28 CREIGHTON L. REV. 733, 788 (1995) (recommending that "[g]uidelines for baton use should emphasize its use for defensive purposes only" and "forbid use of the baton in areas of the body above the torso").  The HPD limits officers to using deadly force in "those circumstances in which officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death."  (Docket Entry No. 40, Ex. A-13).

If the events occurred as Michael Young and others testified, the *Graham* factors weigh in favor of finding excessive force.  Michael Young was not actively resisting arrest or fleeing when Officer Green struck him.  There is also evidence that Young was not aware of Green's presence until after he was hit.  Although Officer Green testified that he saw pushing in the crowd around Michael Young and that Young grabbed his jacket, Michael Young denied pushing or shoving anyone in the crowd.  Young's deposition testimony and Latchley's affidavit suggest that Green believed that Young had elbowed him and retaliated by hitting him in the back of the head with the baton.  A reasonable jury could find that an officer's belief that he had been "elbowed" by someone in a large and boisterous crowd does not justify that officer's immediate use of a potentially lethal weapon to strike the suspected "elbower" in the head.  Officer Green's motion for summary judgment on Michael Young's excessive-force claim is denied.

Michelle Bell also alleges that Officer Green used excessive force in pushing her.  Bell contends that the push was hard enough that she would have fallen had her son not been standing next to her.  Bell had chest soreness after she was pushed but did not seek medical attention.  Officer Green notes *Wilkins v. Gaddy*, — U.S. —, 130 S. Ct. 1175 (2010), in which the Supreme Court rejected the proposition that a plaintiff could not state a claim for excessive force if she alleged only a *de minimis* injury.  Green contends, however, that summary judgment should be granted because Michelle Bell has failed to show that she suffered any discernible injury.

In *Gaddy*, the Court explained that the "core judicial inquiry" in analyzing an excessive-force claim is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Id.* at 1178.  The *Gaddy* Court did not upset the Fifth Circuit's requirement that the plaintiff allege some injury arising from the officer's use of excessive force.  *See Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); *see also Chambers v. Pennycook*, 641 F.3d 898, 905 n. 2 (8th Cir. 2011) (implying that *Gaddy* does not take a stand on this question and citing *Glenn*).  "[A]n inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim."  *Gaddy*, 130 S.Ct. at 1178.  But the Court also noted that, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  *Id.*  at 1178–79 (emphasis added).

Taking the facts in the light favorable to Bell, the push she received was not excessive force as a matter of law.  There was a large crowd waiting outside the Athlete's Foot store.  The HPD officers were taking steps to control that crowd.  Those steps included stopping people from

approaching as the situation involving Michael Young and his sons, Joseph and Michael, Jr became tense.  Michelle Bell was walking toward the parking lot.  Officer Green instructed her to "move back" and shoved her.  She almost lost balance but did not fall.  She had some chest soreness but no other symptoms.  Such force is not excessive in light of the circumstances.

The absence of discernible injury weighs heavily against an inference that the amount of force Green used was clearly excessive to the need or unreasonable in volatile circumstances.  *See Miles v. Staude*, 485 F. App'x 687, 688 (5th Cir. 2012) (noting that the absence of injury is one factor that could be considered under *Gaddy*).  Bell's susceptibility due to her recent surgery does not alter this analysis because she has not shown that Green should have been aware of her condition or that Green's actions aggravated her preexisting health problems.  To the contrary, the fact that, despite her fragile condition, Bell had no symptoms other than some soreness weighs in favor of finding that Green did not use excessive force.  Summary judgment is granted dismissing Michelle Bell's claims against Officer Green for use of excessive force.

### c.      Equal Protection

The plaintiffs allege that Green violated their Fourteenth Amendment rights to equal protection.  "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  *Johnson*, 876 F.2d at 479 (citing *Washington v. Davis*, 426 U.S. 229, 247–48 (1976)).  As an African-American, Michael Young is a member of a protected class.  He has also pointed to evidence of intentional discrimination.  Young testified that after Green struck him with his baton, Green stated, "Nigger, I'm going to kill you."  (Docket Entry No. 39, Ex. D at 33–36).  Officer Ellis's incident report states that Green used a racial epithet.  (Docket Entry No. 46, Ex. 2).  The

Fifth Circuit has held that a police officer's use of racial epithets, combined with harassment or other unlawful actions, may show an equal-protection violation. *See, e.g*, *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) ("We have impliedly held that racial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation." (citing *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999)).

In *Johnson v. Morel*, 876 F.2d 477 (5th Cir. 1989) (en banc), five black men were riding in a car when it stalled on a bridge. A police officer began pushing the car over the bridge with his police car. As he was doing so, the officer shouted racial slurs at the men over a loudspeaker. When the stalled car reached the foot of the bridge, the driver got out of the vehicle. The officer tightly cuffed him and placed him under arrest. The driver sued, alleging that the officer had used excessive force and denied him equal protection by targeting him and other passengers based on race. Noting that the officer "humiliated and harassed" the plaintiff and that "the insults and harassment were explicitly racist," the Fifth Circuit held that "[i]f [the plaintiff] is able to show a constitutional violation, he is then entitled to damages for his injury." *Id.* at 479.[9]

The City argues that using "a racial epithet while applying unreasonable force" is not enough to show an equal-protection violation. (Docket Entry No. 39 at 2 n.2). It points to the Fifth Circuit's decision in *Williams v. Bramer*, 180 F.3d 699. In *Bramer*, Sir Williams sued two police officers

---

[9]   Courts in other jurisdictions have also held that a police officer's use of racial epithets, when accompanied by other constitutional violations, is evidence of an equal-protection violation. *See, e.g.*, *Cole v. Fischer*, 379 F. App'x. 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion."); *King v. City of Eastpointe*, 86 F. App'x. 790, 814 (6th Cir. 2003) ("The use of racially discriminatory language can provide some evidence of a discriminatory purpose when that language is coupled with some additional harassment or constitutional violation."); *Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir. 1986) ("[W]hen the racially derogatory language is coupled with conduct infringing the prisoner's right to security of his person, an inference arises that the conduct was motivated by racial bias.").

under § 1983, alleging that one of those officers, Officer Bramer, had choked him while searching his mouth and again in response to his complaints about that search.  Williams also alleged that another officer, Officer Angelino, had used a racial epithet after Williams asked for his name and badge number.  Williams had acknowledged that Angelino did not arrive on the scene until after Bramer stopped choking him.  The court found that there was nothing in the record to link Bramer's conduct to Angelino's because "Angelino neither played a part in physically abusing Williams nor engaged in any activity that would constrain Williams's freedom."  *Id.* at 706.  The court held that "an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."  *Id.*  But it also found that an officer's use of a racial epithet against a citizen can be "strong evidence that a comment *or action* is racially motivated."  *Id.* (emphasis added).

The plaintiffs' allegations and the evidence in this case are distinguishable from those at issue in *Bramer*.  In that case, the officer who used the racial epithet was not the officer who allegedly used excessive force.  Indeed, the officer who used the epithet was not present when the other officer allegedly choked the plaintiff.  Here, the plaintiffs have pointed to evidence that the same officer who allegedly used excessive force against, and unlawfully detained, Michael Young also directed a racial epithet towards him.

Green's motion for summary judgment is denied on the plaintiffs' equal-protection claims.

### d.    Unlawful Detention and Arrest

The plaintiffs allege that Green improperly detained and arrested Michael Young, in violation of the Fourth Amendment.[10]  Unlawful detention and arrest claims "implicate the Fourth Amendment's proscription against unreasonable seizures." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 845 (5th Cir. 2009).  Officer Green's summary-judgment motion does not address Michael Young's unlawful detention and arrest claims. There are also factual and legal issues that would preclude granting summary judgment on the present record.

Officer Green's actions — including striking Young, forcing him out of the crowd, telling him to turn to face the police car, placing his hands behind his back, stating that he was under arrest, and beginning the process of handcuffing him — suggest that Young would have reasonably believed that he was not free to leave.  Although the detention was brief, the nature of Green's actions and the absence of evidence suggesting an investigative purpose might support an inference that Young was under arrest and not subject to an investigative detention.  *See Short v. West*, 662 F.3d 320, 327 (5th Cir. 2011) (distinguishing an arrest from an investigatory detention based on whether an officer's actions were "reasonably related in scope to investigatory detention.").  If Green's seizure of Young was an arrest, Green must show probable cause.  "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000).  Officer Green has not stated what offense he believed Michael Young committed or pointed to evidence showing that he had a basis to conclude that Michael Young had committed that offense.

---

[10]  The plaintiffs also allege that Green's actions were an "unlawful attempted seizure" of Michael Young.  "Attempted seizures of a person are beyond the scope of the Fourth Amendment." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).  Summary judgment is granted on the plaintiffs' claims that Green's action were an attempted seizure of Michael Young.

Green's summary-judgment motion is denied as to Michael Young's unlawful detention and arrest claims.

### e.      Conspiracy

In the original complaint, the plaintiffs alleged that "by failing to properly investigate the shooting of Steven Guidry," the HPD and Green conspired to interfere with the plaintiffs' civil rights in violation of 42 U.S.C. § 1985.  As the plaintiffs conceded in their response to the City's summary judgment motion, "[t]he City of Houston is a single legal entity and, as a matter of law, its employees cannot conspire among themselves."  *Swilley v. City of Houston*, 457 F. App'x. 400, 404 (5th Cir. 2012) (citing *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).  Summary judgment is granted dismissing the plaintiffs' § 1985 claims.

### f.      Municipal Liability

The plaintiffs alleged that the City of Houston is liable for Green's violations of their constitutional rights.  The alleged bases for municipal liability are that the HPD provided inadequate training in the use of force, (Docket Entry No. 1, ¶ 4.4); failed adequately to discipline officers who use excessive force against citizens, (*id*. ¶ 4.5); inadequately investigated complaints about police officer misconduct, (*id*. ¶ 4.6); provided inadequate training on detention practices and the use of handcuffs, (*id*. ¶ 4.7); and ratified Green's actions, in part, by not properly investigating his shooting of Guidry, (*id*. ¶ 4.9).

A city may not be held liable under § 1983 on a theory of *respondeat superior* liability for the acts of its employees, such as police officers. Instead, a city may only be liable for its own acts or acts that are directly attributable to it "through some official action or imprimatur."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  "To establish municipal liability under §

1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson*, 588 F.3d at 847.

Official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* (internal quotation marks omitted). "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("Deliberate indifference to claims of such civil rights violations — tantamount to a custom or policy sufficient to support municipal liability under § 1983 — may be inferred from a municipality's lack of appropriate response to repeated complaints of such violations.").

"A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration omitted). "Proof of a single instance of unconstitutional activity is not sufficient for § 1983 municipal liability." *Valentine Foundation v. Uphoff*, 211 F. App'x 276, 278 (5th Cir. 2006) (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "Furthermore, a 'handful' of instances do not constitute a pervasive custom or practice." *Garza*, 2011 WL 3925020, at *4 (citing *Pineda*, 291 F.3d at 329); *Saenz v. Dallas Cnty. Cmty. College Dist.*, 2011 WL 1935742, at *8 (N.D. Tex. May 16, 2011).

        **i.**        **The Claims of Failure to Investigate and Failure to Discipline**

The plaintiffs alleged that the City was negligent in investigating Michael Young's complaint to the HPD because Lt. Allen ignored testimony that was inconsistent with Green's statements, did not consider Green's prior violations of HPD policy, and downplayed the significance of Michael Young's injuries. (Docket Entry No. 43, ¶ 17). The plaintiffs also contend that the HPD's command staff improperly removed references to racial slurs from the official report and downgraded Allen's finding that Young had used excessive force to a finding that he had mistreated a citizen. (*Id*, ¶ 18).

The plaintiffs have not shown that, in investigating Michael Young's complaint, Lt. Allen ignored evidence that was inconsistent with Green's statements. The plaintiffs do not state which testimony was ignored. They point generally to Allen's deposition testimony about Green's statements during the IAD investigation. But Allen's testimony does not suggest that the HPD ignored evidence inconsistent with Green's statements. (Docket Entry No. 43, Ex. 3 at 23–26). The HPD's final report on its investigation into Michael Young's complaint rejects Green's claim that he had "accidentally" hit Michael Young on the head with a baton. The IAD found that: "[h]ad Officer Green's baton strike been directed at the hand of Mr. Young, as Mr. Young's hand grasped Officer Green's jacket, it is highly unlikely the [sic] Officer Green's baton would have struck the back of Mr. Young's head." (Docket Entry No. 40, Ex. A-5). The IAD report also noted that "Mr. Young's family members all described Officer Green coming from behind Mr. Young and striking him with the baton." (*Id*.). The report concluded that "the evidence . . . supports that Officer Green made unnecessary physical contact with Mr. Young" and that "Green recklessly rushed into the situation without slowing to re-evaluate the situation as his perspective changed." (*Id*.). As a result of the IAD investigation, Green received a 20-day suspension and was removed from patrol duty during this lawsuit.

30

The plaintiffs are correct that the final report includes a summary of Green's statements to the investigators. The inclusion of this summary, however, does not show that the HPD ignored other evidence.

Nor does the evidence support the plaintiffs' argument that the HPD failed to take Green's prior conduct into account during its investigation. The plaintiffs allege that Lt. Allen did not consider Green's "behavior and/or temperament in the context of known prior incidents, which is apparently standard operating procedure for HPD." (Docket Entry No. 43, ¶ 17). Lt. Allen testified that his investigation for the IAD was limited to the events alleged in Michael Young's complaint to the HPD. (Docket Entry No. 43, Ex. 3 at 11–12). The fact that Allen's role did not extend to investigating Green's prior record is not evidence that other officers involved in the HPD's multitiered disciplinary system did not consider such evidence. HPD Chief McLelland's memorandum states that "in determining the severity of discipline," he considered Officer Green's "disciplinary history, work record, and history in the Houston Police Department." (Docket Entry No. 40, Ex. A-11).

The record also shows that the HPD did not downgrade Lt. Allen's finding that Officer Green had used excessive force or remove references to Green's use of racial slurs from its report. There is evidence that Allen had initially recommended finding that Green violated the HPD's use-of-force policy. Dirden instructed Allen to remove that finding from the final investigative report. But Chief McLelland's memorandum stated that Officer Green received a 20-day suspension based in part on the finding that he failed "to comply with Houston Police Department rules and regulations regarding USE OF FORCE." (Docket Entry No. A-11 (emphasis in original)). Contrary to the plaintiffs' argument that the HPD tried to conceal Officer Green's racial epithets, the final

31

IAD report included Michael Young's statement that "Officer Green began to shove him while yelling, 'Nigger, I will kill you.'" (Docket Entry No. 40, Ex. A-5).

The plaintiffs argue that the IAD report did not fully reflect the extent of Michael Young's injuries from the baton strike. The investigative report stated that Green's "baton strike did not cause a laceration or overtly obvious lump or contusion" and that Green's strike was "too weak to cause serious injury." (Docket Entry No. 40, Ex. A-5). Michael Young and other witnesses testified that the baton strike did not cause him to bleed but did cause a concussion. The omission of the concussion diagnosis does not support a finding that the HPD's disciplinary and investigation policies are constitutionally inadequate.

The plaintiffs have also failed to raise a factual dispute material to deciding whether the HPD's investigatory and disciplinary practices reflected a policy or custom of condoning its officers' use of excessive force. The plaintiffs argue that, although record does not show that Officer Green was guilty of previous allegations against him, the fact that he "knew how the complaint system worked and was repeatedly cleared of charges is certainly sufficient to raise a genuine question of material fact" as to whether the HPD's investigations of his alleged prior misconduct were sufficient. (Docket Entry No. 43, ¶ 14). The plaintiffs contend that the HPD's command staff "reviewed these incidents, changed the findings, and repeatedly cleared Officer Green of wrongdoing or reduced his level of culpability." (*Id.*). But the plaintiffs neither submitted nor identified evidence showing that the HPD's investigations into previous complaints about Green were insufficient. Thirty-four complaints, including three for improper use of force, were filed against Green before December 23, 2010. Aside from Michael Young's complaint, the complaints against Green alleging use of force, improper conduct and behavior, and harassment were "not sustained." Some prior complaints for

32

other infractions, including for improper police procedure, were sustained.  (Docket Entry Nos. 53, Ex. E, at 14; 44).

The fact that previous complaints alleging improper conduct were filed against Green is not evidence that Green engaged in that conduct.  *See Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 384 n.45 (5th Cir. 2005) (declining to consider unsubstantiated complaints against police officers); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[T]he number of complaints bears no relation to their validity.").  With one exception, the plaintiffs have not described the substance of prior allegations against Young or presented or pointed to evidence showing that Young committed the violations alleged or that the HPD's investigations into those allegations were insufficient.  The plaintiffs have also not provided context for determining how the number and nature of the complaints against Green compare to other patrol officers with similar police experience. *Castillo v. City of Corpus Christi*, 2012 WL 1308992, at *10 (S.D. Tex. Apr. 16, 2012) ("Without evidence of statistical significance of the complaints, the complaints, alone, do not prove anything beyond the fact that some complaints were made.")*; see also Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (finding that evidence that an officer brandished his gun during a traffic stop, committed one other incident of deadly force, and was accused of using excessive force on two other occasions did not establish a "pattern" of unconstitutional conduct).

The only prior complaint that the plaintiffs specifically discuss involves Green's February 24, 2010 shooting of Stephen Guidry.  The plaintiffs contend that the HPD's investigation into Green's shooting of Guidry was "remarkably cursory" because the investigative officer complied with an unwritten policy of finishing his investigation within 60 days and did not examine Green's testimony at Guidry's criminal trial.  (Docket Entry No. 43 ¶ 16).  The plaintiffs also argue that the

33

HPD ratified Green's shooting of Guidry by failing to discipline him.  (Docket Entry No. 43 ¶ 16).

Sergeant Stephen C. Ridling, who conducted the investigation into Green's shooting of Guidry, testified that IAD investigators are expected to complete their investigations within 60 days even though they are officially permitted additional time.  The plaintiffs have not shown that 60 days is insufficient either generally or specifically for the investigation of the Guidry shooting.  In the Guidry investigation, Office Green and Guidry were the only witnesses to the shooting itself, and Guidry refused to speak with police investigators.  The police did interview other individuals who observed the events leading up to the shooting.  These individuals stated that Guidry had been drinking and initially refused to pull over his vehicle after Green signaled for him to stop.  Given the small number of witnesses and the lack of evidence contradicting Officer Green's statements, the plaintiffs have not shown that the HPD's investigation was insufficient or that it improperly exonerated Green.

The plaintiffs have also failed to connect the HPD's alleged custom of finishing its investigations within 60 days to the IAD's investigation into Michael Young's complaint.  Based on the date that the IAD issued its report, the HPD's investigation into Young's complaint lasted six months.  The HPD's investigative file also shows that the IAD interviewed around twenty witnesses and reviewed other documentary evidence.  (Docket Entry No. 39, Ex. A-7).  The plaintiffs have not shown how long it took the HPD to complete the Young investigation.  There is no basis to conclude that the investigation — which sustained Young's allegations — was insufficient.

The plaintiffs also criticize Sgt. Ridling for not considering Green's testimony at Guidry's criminal trial as part of the HPD investigation into the Guidry shooting.  The record does not reveal when the trial occurred or what aspects of Green's testimony could have changed the IAD

investigation's outcome.  Nor does the record support an inference of a policy or custom of inadequate investigations into shootings by police officers.  There is also no evident link between Ridling's failure to consider Green's trial testimony and the investigation into Young's complaint, which sustained his allegations against Green.  Michael Young was not charged with a crime, and the plaintiffs do not point to any trial testimony that the HPD failed to consider.

The plaintiffs allege that the HPD has a history of "downplaying the significance of incidents of police misconduct." (Docket Entry No. 43 ¶ 19).  The plaintiffs refer to Allen's testimony that IAD investigators' findings and conclusions are reviewed by superior officers, who may modify or reject them.  (Docket Entry No. 43, Ex. 3, at 38).  The fact that the HPD has a process for reviewing IAD reports does not show that the investigations are insufficient.  The record does not support an inference that the HPD has a custom or practice of "watering down" findings against its officers.

The plaintiffs also point to the fact that no recent HPD investigation into a shooting by an HPD officer has concluded that the shooting was unjustified.  Between March 2005 and March 2010, about 170 individuals were shot by HPD officers.  Of these shootings, all but two were determined to have been justified.  The remaining two were classified as "accidental" or "information." (Docket Entry No. 43, Ex. 1).  These numbers do not themselves show that the investigations were inadequate or that the conclusions they reached were incorrect.  Nor does the record show how HPD investigations into shootings relate to the alleged constitutional violations in this case, which did not involve a shooting and in which the investigation sustained the complaint against the officer.

There are no genuine fact disputes material to determining whether the HPD has an official policy or pervasive custom of failing properly to investigate allegations of wrongdoing against its

officers or to discipline those officers.  Summary judgment is granted for the City of Houston on the plaintiffs' claims of failure to investigate and failure to discipline.

### ii.    The Claim of Failure to Train

The plaintiffs allege that Green's use of force against the plaintiffs resulted from the HPD's inadequate training policies.  For a plaintiff to succeed on a failure-to-train claim against a city, they must show that: (1) the city's training policy procedures were inadequate; (2) the city was deliberately indifferent in adopting its training policy; and (3) the inadequate policy caused the constitutional violation.  *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010) (citations omitted).

"Deliberate indifference is more than mere negligence." *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000) (citation omitted). The plaintiffs must show that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  A showing of deliberate indifference is difficult, although not impossible, to base on a single incident. *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000); *Conner*, 209 F.3d at 797.  Claims of inadequate training generally require a showing that prior acts are "fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act must have involved injury to a third party." *Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 n. 34 (5th Cir. 2005) (citation omitted).  The "single incident exception" is narrow.  A plaintiff invoking it "must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind

the constitutional violation." *Id.* at 386 (quoting *Brown*, 219 F.3d at 462) (internal quotation marks omitted).

The plaintiffs have failed to provide or point to record evidence raising an inference that the HPD's training procedures were inadequate.  The Fifth Circuit has held that "when officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate." *Sanders-Burns*, 594 F.3d at 381–82 (5th Cir. 2010).  Green completed the state-mandated training for police officers.  The plaintiffs do not argue that the State's requirements are inadequate, much less specify how they are inadequate.

The plaintiffs argue that Green's use of excessive force against Michael Young is "sufficient for a jury to infer that the training he had received" was inadequate "as to the proper use of force in crowd control situations."  (Docket Entry No. 43, ¶ 13).  But the fact that Green may have violated the plaintiffs' rights is not evidence that his actions were the result of constitutionally inadequate training in crowd-control techniques.  The plaintiffs have not shown that, given Green's experience and his training in the use of force and other police policies and legal requirements, his actions were the "highly predictable consequence of a failure to train." *Davis*, 406 F.3d at 386.

The plaintiffs also point to Green's apparent difficulty in stating the HPD's official use-of-force policy.  (Docket Entry No. 45).  An individual officer's inability to recite a police department use-of-force policy in a deposition does not create a genuine factual dispute material to determining the adequacy of the department's training. *See Canton*, 489 U.S. at 390–91 ("[T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

The plaintiffs contend that because of Green's "propensity to react violently," as evidenced by the number of prior complaints made against Green, the HPD had a responsibility to provide Green with additional, specialized training.  (*Id.* ¶ 11).  The prior use-of-force complaints against Green were not sustained.  The plaintiffs have not shown that the HPD's investigations into these prior complaints were inadequate or that Green had previously violated the HPD's policies on the proper use of force.  The plaintiffs have not provided or identified evidence that supports an inference that the HPD's training policies on the use of force were inadequate or that the HPD was deliberately indifferent to constitutionally protected rights because it failed to give extra training to Green.  Summary judgment is granted dismissing the plaintiffs' claims against the City for deficient training on the use of force.

In their complaint, the plaintiffs also allege that the City of Houston insufficiently trained Green in "when to restrain with handcuffs or deny a citizen his right to freedom."  (Docket Entry No. 1, ¶ 4.7).  The City of Houston has moved for summary judgment on those claims on the basis that the plaintiffs have not pointed to any relevant deficiencies in the HPD's training policies. (Docket Entry No. 39 at 8–9).  The plaintiffs have not responded.  Because the plaintiffs have failed to show that there is a genuine factual dispute material to determining whether the HPD sufficiently trained its officers on when to use handcuffs or restrain individuals, summary judgment is granted dismissing those claims.

### iii.      The Bystander Claims

In a previous opinion, this court granted summary judgment for Green on the plaintiffs' federal-law bystander claims.  This court held that:

> [A] bystander who witnesses a police action, but who is not himself
> or herself an object of that action, cannot recover for resulting

> emotional injuries under § 1983, although there may be such a claim
> under state tort law.  There is no constitutional right to be free from
> witnessing police action, apart from the question of whether that
> action physically injured the target of that action.

*Young v. Green*, 2012 WL 3527040, at *4 (S.D. Tex. Aug. 15, 2012) (citing *Archuleta v. McShan*,

897 F.2d 495, 496–500 (10th Cir. 1990); *Coon v. Ledbetter*, 780 F.2d 1158, 1160–61 (5th Cir.

1986); *Grandstaff v. Borger*, 767 F.2d 161, 172 (5th Cir. 1985); *Landry v. Ferriday*, No. 08-1616,

2009 WL 2900446, at *1 (W.D. La. Sept. 8, 2009); *Thomas v. Frederick*, 766 F. Supp. 540, 556

(W.D. La. 1991)).

For the reasons stated in that prior opinion, the City of Houston is entitled to summary

judgment on the federal claims alleged by the bystander plaintiffs  for observing Green's use of

force against Michael Young.

### g.      Individual Liability

Section 1983 provides a cause of action against an individual who, acting under color of state

law, has deprived a person of a federally protected statutory or constitutional right.  Qualified

immunity protects government officials "from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether

qualified immunity applies, courts use the two-part analysis set forth in *Saucier v. Katz*, 533 U.S.

194 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009).  Courts must decide "(1)

whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2)

if so, whether that right was clearly established at the time of the defendant's alleged misconduct."

*Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009).  "The relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier*, 533 U.S. at 202).

As the *en banc* Fifth Circuit recently held:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that "every 'reasonable official would understand that what he is doing violates [the law].'" To answer that question in the affirmative, we must be able to point to controlling authority — or a "robust 'consensus of persuasive authority'" — that defines the contours of the right in question with a high degree of particularity.

*Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, — U.S. —, —, 131 S.Ct. 2074, 2083, 2084 (2011)) (internal footnotes omitted; alterations in original). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, — U.S. —, —, 132 S.Ct. 1235, 1244 (2012) (internal quotation marks omitted). Plaintiffs have the burden of overcoming the qualified immunity defense. *Bennett v. City of Grand Prairie, Tex.*, 883 F.2d 400, 408 (5th Cir. 1989).

Green maintains that his use of force against Michael Young was not unreasonable in light of clearly established law on December 23, 2010. The record does not support his argument. Viewing the disputed facts in the light favorable to Michael Young, "he committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." *Newman*, 2012 WL 6634975, at *5. Cases decided well before 2010 recognized that an officer's use

of a baton to strike an individual who was not a threat or resisting the officer could be excessive

force. *See, e.g.*, *Spann v. Rainey*, 987 F.2d 1110, 1115–16 (5th Cir. 1993) (holding that officers' use

of a nightstick and their hands to beat an individual in diabetic shock was excessive force);

*Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981) (holding that an officer's use of a nightstick

to strike the face of a bystander photographing an arrest was excessive force).  Moreover, the cases

recognize that the lawfulness of force "does not depend on the precise instrument used to apply it."

*Newman v. Guedry*, — F.3d —, 2012 WL 6634975, at * 5 (5th Cir. Dec. 21, 2012).  The *Graham*

excessive-force factors themselves "can 'clearly establish' the answer, even without a body of

relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  This court has found that none

of the *Graham* factors justify Officer Green's baton strike to Michael Young's head.  Green's

argument fails.

Green has not asserted a qualified immunity defense to Michael Young's equal-protection

claim.  Even if Green had invoked a qualified immunity defense to this claim, his defense would fail.

At the time of Green's actions, it was clear in the Fifth Circuit that police could not take unlawful

actions, including by using excessive force, against individuals on the basis of their race.  *See Morel*,

876 F.2d at 479 (holding that a police officer's actions in humiliating and harassing a citizen on the

basis of his race violated the equal-protection clause); *see also Bramer*, 180 F.3d at 706 (5th Cir.

1999) (find that, while racist speech by a police officer did not violate the equal-protection clause,

racial epithets were evidence that other illegal actions were motivated by race).  Nor has Green

moved for summary judgment on his qualified immunity defense to Michael Young's unlawful-

seizure claim.  Summary judgment is denied as to these claims.

### 2.      The State-Law Claims

The plaintiffs assert several state-law claims against Green and the City of Houston. Michael Young and Michelle Bell allege that the City is vicariously liable under state law for his negligence in training and disciplining Green. Ashley Young, Michael Young, Jr., Joseph Young, Fred Bell, Michelle Bell, and Christian Bell also bring state-law bystander claims on the basis that they were traumatized when they witnessed Green's use of excessive force against Michael Young and Michelle Bell. This court has previously dismissed the plaintiffs' state-law claims against Green in his individual capacity. *Young*, 2012 WL 3527040, at *5. The plaintiffs' state-law claims against the City of Houston are analyzed below.

### a.      The Texas Tort Claims Act

Under Texas law, a governmental entity cannot be held liable for its employees' actions unless there is a constitutional or statutory provision waiving such immunity. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998). A waiver must be clear and unambiguous. *Duhart v. State*, 610 S.W.2d 740, 742 (Tex. 1981). Absent a waiver, a city is entitled to immunity. *City of El Paso v. W.E.B. Invs.*, 950 S.W.2d 166, 169 (Tex. App.—El Paso 1997, writ denied). The Texas Tort Claims Act (TTCA) waives sovereign immunity in limited circumstances. *See Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 586 (Tex. 1996).[11]

---

[11] The TTCA provides:

> A governmental unit in the state is liable for: (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if: (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and (B) the employee would be personally liable to the claimant according to Texas law; and (2) personal injury and death so caused by the condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

The TTCA does not waive immunity for intentional torts.  *See Taylor v. Gregg*, 36 F.3d 453, 457 (5th Cir. 1994); *City of San Antonio v. Dunn*, 796 S.W.2d 258, 261 (Tex. App.—San Antonio 1990, writ denied).[12]

### b.    Notice

The City of Houston has moved for summary judgment on the ground that it lacked notice of the plaintiffs' claims.  Under the TTCA, "a governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred."  TEX. CIV. PRAC. & REM. CODE § 101.101(a).  That notice must describe: (1) the damage or injury claimed; (2) the time and place of the incident; and (3) the incident.  *Id.*  A city may adopt a shorter notice period.  *Id.*, § 101.101(b).  The City of Houston's charter provides for a 90-day notice period.  CHARTER OF THE CITY OF HOUSTON art. IX, § 11, at 40.[13]  However, the

---

TEX. CIV. PRAC. & REM. CODE § 101.021.

[12] The TTCA states:

> This chapter does not apply to a claim: (1) based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or (2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

TEX. CIV. PRAC. & REM. CODE § 101.057.

[13] The relevant Charter provision states:

> Before the City of Houston shall be liable for damages for personal injuries of any kind, the person injured or some one in his behalf shall give the Mayor or City council notice in writing of such injury within ninety days after the same has been sustained . . . . and the failure to so notify the city within the time and manner specified herein shall exonerate, excuse and exempt the city from any liability whatsoever.

*Id.*

TTCA's notice provisions "do not apply if the governmental unit has actual notice that . . . the claimant has received some injury." *Id.* § 101.101(c)

In *Cathey v. Booth*, 900 S.W2d 339 (Tex. 1995), the Texas Supreme Court considered what information must be provided under the TTCA's actual notice provision.  The case involved a stillborn baby.  The parents sued the doctor and the hospital for negligence.  The defendants moved for summary judgment on lack of notice under the TTCA.  The plaintiffs responded that the defendants had  actual notice because they knew about the stillbirth.  Noting that "[t]he purpose of the notice requirement is to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial," the court found that mere awareness that a patient had died "would be the equivalent of having no notice requirement at all because the hospital would be required to investigate the standard of care provided to each and every patient that received treatment." *Id.* at 341.  Actual notice required knowledge of: "(1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved." *Cathey v. Booth*, 900 S.W.2d at 341.

The Texas Supreme Court clarified the actual-notice standard it set out in *Cathey* in *Texas Dept. of Criminal Justice v. Simons*, 140 S.W.3d 338, 339 (Tex. 2004).  The court explained that "we did not mean that the governmental unit was required to know that the claimant had actually made an allegation of fault." *Id.* at 347.  But "*Cathey* cannot fairly be read to suggest that a governmental unit has actual notice of a claim if it could or even should have learned of its possible fault by investigating the incident." *Id.* at 347.  "A governmental unit cannot acquire actual notice merely by conducting an investigation, or even by obtaining information that would reasonably

suggest its culpability.  The governmental unit must have *actual, subjective awareness* of its fault in the matter." *Id.* at 348 (emphasis added).

In *City of Dallas v. Carbajal*, 324 S.W.3d 537 (Tex. 2010), the Texas Supreme Court further clarified the actual notice standard.  The court found that a police report of an automobile accident, stating that the driver had driven into a gap in the street that was "not properly blocked," *id.* at 538, was not actual notice because it "was at most an initial response to the accident," *id* at 537.  The court held that "[a]lthough both parties agree that the road was not properly blocked, the report here did not provide the City with subjective awareness of fault because it did not even imply, let alone expressly state, that the City was at fault." *Id.* at 539.  The court continued: "[t]he report only describes what apparently caused the accident (missing barricades).  It does not say who failed to erect or maintain the barricades." *Id.*

In contrast to *Cathey*, *Simons*, and *Carbajal*, the Texas Supreme Court found that the State hospital defendant in *Univ. of Texas Sw. Med. Ctr. at Dallas v. Estate of Arancibia ex rel. Vasquez-Arancibia*, 324 S.W.3d 544 (Tex. 2010), had sufficient knowledge to satisfy the TTCA's actual notice requirement.  A surgical patient at the hospital died in the hospital's emergency room three days after the surgery.  The surgeon's supervisor investigated the incident and concluded that although there were no "standard of care violations," a "technical error occurred" during the operation and "clinical management contributed to" the patient's death. *Id.* at 549.  Noting the distinction between "fault" and "liability," the court held that, although "[a] jury may absolve the government of liability," the court could not "conclude that [the hospital] was unaware of its fault in producing or contributing to the injury alleged." *Id.* at 550.

45

The plaintiffs argue that the City had actual notice of the plaintiffs' injuries through Michael Young's complaint against Green to the HPD and as a result of the City's investigation. (Docket Entry No. 43 at 24). The plaintiffs have not identified record evidence showing that the City of Houston had notice — actual or otherwise — of its alleged fault in Green's use of excessive force against Michael Young or Michelle Bell. The record shows that within 90 days of December 23, 2010, the HPD received Michael Young's complaint and Officer Ellis's incident report. Neither document stated or suggested that the City was at fault for Green's actions. The HPD gathered additional evidence during its six-month investigation, but it is not clear when it collected the information used in the IAD report. The IAD report and Chief McLelland's disciplinary memorandum were not issued until after the 90-day notice period had run. Even if those documents had been filed earlier, they would not have shown that the City was aware that it was potentially at fault for Green's use of excessive force.

The evidence also does not reflect that the City was aware of injuries to the bystander plaintiffs. Michael Young was the only one of the plaintiffs who filed a complaint against Green with the HPD. The HPD interviewed some of the other plaintiffs during the investigation, but it is not clear when or whether they told the HPD interviewers that watching Officer Green hit Michael Young had caused them injury.

Summary judgment is granted on the plaintiffs' state-law claims because the City lacked the required notice of their claims.

### c.   Vicarious Liability

The City also moves for summary judgment on the basis that under the TTCA, it was immune from vicarious liability for Green's intentional acts. (Docket Entry No. 39 at 20). The City

argues that the plaintiffs' claims against it depend on allegations that Green intentionally used excessive force.  The plaintiffs respond that they do not seek to hold the City vicariously liable for Green's intentional torts.  Instead, their claims are based solely on the City's negligence in "training, supervising, and punishing" Green for his prior improper conduct.[14]  (Docket Entry No. 43).

In its recent decision in *Texas Dept. of Criminal Justice-Community Justice Assistance Div. v. Campos*, 384 S.W.3d 810 (Tex. 2012), the Texas Supreme Court held that "even if a claim is based on an intentional tort, a governmental entity may still be liable for negligence if that negligence is distinct from the intentional tort." *Id.* at 815 (citing *Young v. Dimmitt*, 787 S.W.2d 50, 51 (Tex. 1990) ("Although a governmental unit is immune from claims arising out of intentional torts, petitioners' negligent employment and entrustment claims arise out of the alleged negligence of the city employees supervising the officer, not out of the officer's intentional tort.")).  In *Campos*, the plaintiffs sued several corrections officers for sexual harassment and assault.  The plaintiffs also brought claims against the Texas Department of Criminal Justice (TDCJ), and the Community Supervision and Correction Department (CSDO) for premises liability and negligent hiring, training, supervision, and implementation of policy.  The Texas Supreme Court found that the plaintiffs' claims were not barred by § 101.057(2) of the Texas Civil Practice and Remedies Code, which states that the TTCA does not waive immunity from claims arising out of intentional torts.  *Id.* at 815.  The *Campos* court cautioned, however, that "a cause of action for negligent supervision or training must satisfy the TTCA's use of tangible property requirement."  *Campos*, 384 S.W.3d at 815.  The court held that the plaintiffs' claims against the TDCJ were barred by governmental immunity because

---

[14]  The plaintiffs' complaint does not assert claims against the City of Houston for improperly supervising Green.

their "claims related to negligent failure to train, instruct, and discipline involved the misuse or non-use of information which is not tangible property." *Id.* The court also rejected the plaintiffs' arguments that the TCDJ was liable because "it made tangible property available" to the corrections officers. *Id.* Because the plaintiffs did not claim that the property the TCDJ provided to the corrections officers was "inherently unsafe," the TCDJ's immunity was "not waived for making the property available to them." *Id.*

The negligence claims alleged by the plaintiffs in the present case fail for the reasons that the Texas Supreme Court identified in *Campos*. The plaintiffs have not identified any tangible property that the HPD negligently misused in the course of training, investigating, or disciplining Green for prior conduct.[15] Summary judgment is granted on these claims

## III. The Motion for Leave to Amend the Complaint

The plaintiffs have moved for leave to amend their complaint to join Athlete's Foot as a defendant on the basis that it did not provide adequate security on the night of the "Midnight Madness" sale. The plaintiffs also seek to amend their negligence claims against the City to allege that it failed to monitor Officer Green's mental state and his use of psychotropic drugs. (Docket Entry Nos. 48, 49). The City of Houston and Officer Green both oppose granting leave to amend. (Docket Entry Nos. 50, 52).[16]

---

[15] This court does not reach the City's arguments under § 101.156 of the Texas Civil Practice and Remedies Code that the plaintiffs' claims are based on discretionary decisions that are not subject to the TTCA's waiver provisions.

[16] Green also contends that the plaintiffs failed to comply with Local Rule 7.1.D by not conferring with opposing counsel before filing their motion for leave to amend and Local Rule 7.1.C because the motion was not accompanied by a separate proposed order. (Docket Entry No. 50, ¶ 1). In their reply brief, the plaintiffs state that, after Green filed his opposition brief, the plaintiffs conferred with opposing counsel. (Docket Entry No. 51, ¶ 5). The plaintiffs attached a proposed order to their reply. (*Id.*, Ex. 2). The plaintiffs have satisfied Local Rules 7.1.C and 7.1.D.

### A.    The Legal Standards

This court's October 3, 2011 scheduling and docket control order set a January 13, 2012 deadline to amend pleadings.  The plaintiffs' motion for leave to amend was filed on October 8, 2012.  When the deadline for seeking leave to amend pleadings has expired, a court considering a motion to amend must first determine whether to modify the scheduling order under the good cause standard of Federal Rule of Civil Procedure 16(b)(4).  Rule 16(b)(4) states that a court-ordered deadline may be modified for good cause and with the court's consent.  FED. R. CIV. P. 16(b)(4).  Courts consider four factors in deciding whether there is good cause to amend a scheduling order: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  *Southwestern Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003).  A district court has "broad discretion to preserve the integrity and purpose of the pretrial order."  *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979).

If the movant first satisfies the requirements of Rule 16(b)(4), the court may determine whether to grant leave to amend under the more liberal standard of Rule 15(a)(2).  Rule 15(a) provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party before a responsive pleading is served.  FED. R. CIV. P. 15(a). After a responsive pleading is served, the party may amend only "with the opposing party's written consent or the court's leave."  *Id.*  Although a court "should freely give leave when justice so requires," *id.*, leave to amend "is not automatic."  *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).  A district court reviewing a motion to amend pleadings under Rule 15(a) may consider

factors such as "undue delay, bad faith or dilatory motive[,] . . . undue prejudice to the opposing

party, and futility of amendment."   *In re Southmark Corp.*, 88 F.3d 311, 314–15 (5th Cir. 1996).

**B.      Analysis**

The plaintiffs contend that their proposed amendments are based on evidence discovered

during their July 13, 2012 deposition of Green.  The plaintiffs point to Green's testimony that the

Athlete's Foot store did not provide enough security to control the crowd and that he suffered from

depression and was taking antidepressants around December 23, 2010.  (Docket Entry No. 51, Ex.

A, 38–39, 70–71).

The plaintiffs have not shown good cause to join the Athlete's Foot store as a defendant or

to assert additional claims against the City.  The plaintiffs have not sufficiently explained their

failure to move for leave to amend earlier.  The plaintiffs were aware before they filed this suit that

the events that form the basis of their complaint took place at an Athlete's Foot store.  The plaintiffs

were also aware of the crowd size and aggressiveness and the limited role the store's security guards

played in attempting to control the crowd.  Had the plaintiffs required additional information about

the Athlete's Foot store's security procedures, they could have obtained it before they deposed

Green.  Similarly, the plaintiffs could have discovered that Green suffered from depression much

earlier in this litigation.  Green's deposition testimony about his mental health arose from direct

questions posed by the plaintiffs' attorney.  The plaintiffs could have asked these same questions

in their written discovery requests.

Even if Green's deposition was the first time that the plaintiffs could reasonably have been

aware of their proposed claims against Athlete's Foot and additional claims against the City, the

plaintiffs' delay in moving for leave to amend their complaint was excessive.  The plaintiffs deposed

50

Green on July 13, 2012 but did not seek to amend their complaint until October 8, 2012, after the discovery deadline had passed and the City of Houston had moved for summary judgment.

Permitting the plaintiffs to join the Athlete's Foot store as a defendant would substantially delay this litigation and prejudice the original defendants. The plaintiffs would need time to complete service, Athlete's Foot would need time to file an answer, and the parties would need time to obtain discovery and file dispositive motions. Allowing the plaintiffs to assert additional claims against the City based on Green's mental health would also cause undue delay. It would require the court to reopen discovery and permit the parties to file another round of dispositive motions. These delays are unreasonable in a case that is now on the eve of trial.

The plaintiffs also have not shown that the additional claims that they seek to assert against the City would survive a motion to dismiss. In their memorandum in support of their motion for leave to amend, the plaintiffs state that they seek to amend their complaint to "amend Plaintiff's [sic] claims of negligence against Defendant City of Houston for its failure to monitor Officer Green's psychological state use of psychotropic drugs." (Docket Entry No. 48, ¶ 4). Negligence claims are not cognizable under § 1983. The plaintiffs' negligence claims would also fail under state law for some of the reasons explained in other contexts earlier in this opinion.

The plaintiffs' motion for leave to amend their complaint is denied.

## II.   Conclusion and Order

For the reasons stated above, this court grants summary judgment dismissing:

- Michael Young's cruel and unusual punishment claims against the City and Green;

- Michael Young's due process claims against the City and Green;

- Michael Young's conspiracy claims against the City and Green;

- Michelle Bell's excessive-force claims against the City and Green;

- the plaintiffs' bystander claims against the City;

- Michael Young's failure-to-train, failure-to-investigate, and failure-to-discipline claims against the City; and

- the plaintiffs' state-law claims against the City.

This court denies summary judgment on:

- Michael Young's excessive-force claim against Green;

- Green's qualified-immunity defense to Michael Young's excessive-force claim; and

- Michael Young's equal-protection claim against Green;

This court also denies the plaintiffs' motion for leave to amend their complaint.

A status and scheduling conference is set for **March 5, 2013** at 2:00 p.m. in Courtroom 11-B.

SIGNED on February 28, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge